# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

Plaintiff,

v.

WASSILLIE S. CHOCKNOK,

Defendant.

Case No. 3:24-cr-00130-SLG-KFR

## REPORT AND RECOMMENDATION RE MOTION TO SUPPRESS

Before the Court is a Motion to Suppress ("Motion") filed by Defendant Wassillie S. Chocknok.[1] The government responded in opposition to the Motion.[2] Both parties requested an evidentiary hearing on the Motion; the Court granted this request and held an evidentiary hearing on May 22, 2025.[3] Both parties filed post-hearing supplemental briefing.[4]

Upon review and consideration of the briefing and evidence, the Court finds that Defendant was not in custody when he made the statements he seeks to suppress. Because Defendant was not in custody, law enforcement was not required to administer *Miranda* warnings to him, and there is no indication that his statements were involuntary. Accordingly, the Court concludes that the challenged statements should not be suppressed and recommends that the Motion be **DENIED**.

## I. BACKGROUND

### A. Facts

#### 1. October 7, 2023 interview

On October 7, 2023, the Alaska State Troopers ("AST") in Dillingham received a call from a local Village Public Safety Officer ("VPSO" or "VPO") regarding a boat that had been

---

[1] Docket 25.
[2] Docket 27.
[3] Docket 31.
[4] Docket 39; Docket 40.

found swamped on the Nushagak River.[5] AST soon learned that the boat belonged to Defendant's father, that Defendant had recently taken the boat upriver, and that Kelly Coopchiak had been with Defendant on the boat.[6] AST also learned that Defendant, who lived in New Stuyahok, had made it back to Dillingham, but Coopchiak's whereabouts were unknown.[7]





Maps depicting the area in Southwest Alaska where Dillingham, New Stuyahok, and the Nushagak River are located. (Google Maps)

On October 9, 2023, Trooper Trenton Harris located Defendant at a small residential cabin in Dillingham.[8] Trooper Harris was armed and in uniform.[9] One of the occupants of the cabin opened the door to Trooper Harris, who saw three other individuals—including Defendant—sitting inside drinking alcohol.[10] Trooper Harris said that he was looking for Defendant.[11] Defendant claimed that his name was David, but Trooper Harris recognized Defendant from a photo he had previously seen and said,

---

[5] Docket 27-1 at 1. Dillingham is approximately 330 miles southwest of Anchorage, Alaska. New Stuyahok is approximately 50 miles upriver from Dillingham.

[6] Docket 35 at 7:25–8:7, 9:9–13.

[7] *Id.* at 9:13–15; 35:3–6.

[8] Docket 27-1 at 12. The cabin belonged to a third party. *Id.*; Docket 35 at 11:2.

[9] Docket 35 at 14:11–17.

[10] *Id.* at 9:24–10:1, 10:17–20, 14:11–17.

[11] Def. Ex. 1 at 0:43–47.

"Wassillie, I know it's you, step out with me. . . . Come on out here with me."[12] Defendant complied.[13]

Once the pair were outside, standing about three feet apart from each other by a truck parked in the driveway a few feet beyond the cabin, Trooper Harris began interviewing Defendant.[14] Trooper Harris explained that he wanted to talk with Defendant because AST was "trying to find [Coopchiak]."[15] Trooper Harris noted that AST had been told that Defendant had gone upriver in a boat, and asked Defendant what had happened.[16] Defendant responded that Coopchiak had "r[un] off in the boat," which had forced Defendant to "take another boat and drift on."[17] Trooper Harris observed that he had repeatedly tried to reach Defendant on his cell phone, and asked Defendant why he had not responded.[18] Defendant did not immediately answer. Trooper Harris then followed up with several additional questions about the circumstances of his trip on the Nushagak River. Defendant said that he and Coopchiak had gone on a trip to catch whitefish, and, after Trooper Harris asked whether they had been drinking out there, Defendant acknowledged that they had.[19] Trooper Harris asked Defendant if he had not responded to Trooper Harris's messages because he had been drinking, to which Defendant said yes.[20] In response, Trooper Harris said, "The thing is, man, I'm trying to make sure [Coopchiak] is okay, that's my biggest goal, cause now I've found you, right, so now I need to find her."[21]

After asking a few more questions about the trip, Trooper Harris asked Defendant if he was on probation.[22] Defendant responded that he was.[23] Trooper Harris then asked if

---

[12] *Id.* at 0:47–1:03, 1:35–38; Docket 35 at 10:3–5.

[13] Docket 35 at 10:14–16.

[14] *Id.* at 11:3–6, 30:5–10, 30:23–24, 31:2–4.

[15] Def. Ex. 1 at 1:40–53.

[16] *Id.*

[17] *Id.* at 1:53–2:07. Defendant later said that he "fell asleep and [Coopchiak] took off." *Id.* at 8:33–38.

[18] *Id.* at 2:26–31.

[19] *Id.* at 2:50–53, 3:50–56.

[20] *Id.* at 4:40–47.

[21] *Id.* at 4:51–56.

[22] *Id.* at 9:03–05.

[23] *Id.* at 9:05–06.

Defendant was "supposed to be drinking" and if he had told his probation officer about the drinking.[24] Defendant responded to each question in the negative.[25] Trooper Harris next asked Defendant, "You willing to give me a [portable breath test]?"[26] Defendant agreed, and Trooper Harris proceeded to administer the test, which indicated that Defendant was currently intoxicated.[27]

Based on this information, Trooper Harris told Defendant to call his probation officer.[28] Trooper Harris allowed Defendant to go back into the residence to retrieve his phone to make the call.[29] Defendant went back inside; meanwhile, Trooper Harris attempted to contact the Dillingham probation office. After Defendant returned outside and while Trooper Harris was still on the phone, Trooper Harris noticed Defendant drop an alcohol bottle on the ground.[30] Trooper Harris asked Defendant if the bottle had any alcohol in it, which Defendant denied, but Trooper Harris took a look and saw that it was about one-third full.[31] Trooper Harris opined that this was an example of Defendant "acting like [he was] hiding something from [Trooper Harris]."[32] Trooper Harris said he was not sure if he believed that Defendant had "just [been] up there doing whitefish and then [Coopchiak] just left because [Defendant] fell asleep."[33]

Trooper Harris then asked Defendant how they were "going to do this" given that

---

[24] *Id.* at 9:06–12.
[25] *Id.*
[26] *Id.* at 9:29–31.
[27] *Id.* at 9:31–50; Gov't Ex. 6.
[28] Def. Ex. 1 at 10:25–29.
[29] *Id.* at 10:30–40. Trooper Harris also testified at the evidentiary hearing that Defendant asked to use the bathroom at some point during the interview, and that Trooper Harris let Defendant "walk around the truck[]" in order to use the bathroom. Docket 35 at 14:24–15:11. Although the Court finds that Trooper Harris was credible, the audio recording of the encounter appears to indicate that Defendant only asked (and was allowed) to use the bathroom at the local AST post. The Court thus declines to find that Trooper Harris expressly let Defendant use the bathroom during the questioning in the driveway.
[30] Def. Ex. 1 at 12:30–48; Docket 35 at 16:7–15.
[31] Def. Ex. 1 at 12:57–13:24; Gov't Exs. 7–8.
[32] Def. Ex. 1 at 13:30–48.
[33] *Id.* at 13:48–57.

Defendant probably needed to return home to New Stuyahok.[34]  Defendant said he did not know.[35]  Trooper Harris agreed and stated that he was trying to contact the probation office "to see what they want[ed] to do."[36]  As Trooper Harris was making a series of other calls in an effort to reach the probation office, Defendant started pacing around the yard.[37]  Trooper Harris told Defendant not to "walk off" and to "come back over here."[38]  Trooper Harris noted that Defendant was "freaking [him] out walking around."[39]

After several attempts to reach the probation office, Trooper Harris suggested to Defendant that they "just go to post."[40]  Trooper Harris said, "You can come with me, you shouldn't be here drinking alcohol anyways.  Go have a cup of coffee and sober up.  Sound fair?"[41]  Defendant agreed and got into Trooper Harris's vehicle.  At this point, about 23 minutes had passed since Trooper Harris's arrival at the cabin.[42]  The pair arrived at the local AST post about five minutes later.[43]  Trooper Harris eventually arrested Defendant at the direction of a probation officer for violating the terms of his probation agreement by consuming alcohol.[44]

### 2.  October 20, 2023 interview

On October 20, 2023, Trooper Cody Royer and AST Investigator Timothy Powell traveled to New Stuyahok as part of the investigation into Coopchiak's disappearance.[45]  Investigator Powell asked Trooper Royer to find Defendant and ask him to come down to the VPSO "shack," which was effectively the local police station, for an interview.[46]  That afternoon, Trooper Royer drove with VPO Simeon Yukluk in a marked VPSO patrol vehicle

---

[34] *Id.* at 14:13–18.
[35] *Id.* at 14:18–22.
[36] *Id.* at 14:23–32.
[37] Docket 35 at 20:15–23.
[38] Def. Ex. 1 at 15:05–20.
[39] *Id.* at 15:55–58.
[40] *Id.* at 23:05–20.
[41] *Id.*
[42] *Id.* at 0:43–24:00.
[43] *Id.* at 28:20.
[44] Docket 35 at 20:9–14; Gov't Ex. 5 at 8.
[45] Docket 35 at 35:2–4.
[46] *Id.* at 35:4–7, 37:16–19, 49:25–50:3, 64:4–10.

to Defendant's parents' house.[47] Trooper Royer was armed and in uniform, while VPO Yukluk was in uniform but not armed.[48] Trooper Royer had a brief conversation with Defendant's father at the front door and then asked if Defendant was home.[49] Defendant came to the front door, where Trooper Royer explained that he and VPO Yukluk were there to follow up on the Coopchiak case, that there was an investigator in town, and that the investigator had some questions for Defendant.[50] Trooper Royer asked if Defendant would be willing to go down to the VPSO shack.[51] Defendant stated that he would.[52] Trooper Royer and VPO Yukluk drove Defendant to the VPSO shack, which was located down a dirt road less than a mile away from Defendant's parent's house.[53] Defendant sat in the back of the VPSO vehicle for the short ride over.[54]

Upon their arrival at about 1:52 p.m., Trooper Royer, VPO Yukluk, and Defendant entered the VPSO shack.[55] The front door of the building opened into a medium-sized, run-down room that contained multiple doors to other, smaller rooms.[56] Once they were inside the main room, Investigator Powell greeted Defendant and introduced himself as "Tim."[57] Investigator Powell was armed and in plain clothes.[58] Investigator Powell and Defendant sat down to the right of the



Picture of the VPSO shack. (Gov't Ex. 3)

[47] *Id.* at 37:8–10, 43:3–5.
[48] *Id.* at 41:25–42:1; 48:19–49:4.
[49] A recording of Trooper Royer and VPO Yukluk's initial contact with Defendant does not appear to exist. *See* Docket 35 at 35:25–36:22.
[50] *Id.* at 39:9–16.
[51] *Id.* at 39:16.
[52] *Id.* at 40:2–4.
[53] *Id.* at 37:10–21, 42:22–43:2, 51:11–14.
[54] *Id.* at 50:23–51:10.
[55] Def. Ex. 2 at 0:00–10.
[56] Gov't Exs. 1–4.
[57] Def. Ex. 2 at 00:15–00:25.
[58] Docket 35 at 70:23–71:3.

front door at a rectangular desk, where they were positioned at adjacent sides of the desk facing and within touching distance of each other.[59] Investigator Powell sat at the long open side of the desk, while Defendant sat at one of the short, closed sides, facing the window.[60] Trooper Royer and VPO Yukluk retreated elsewhere inside the building: Trooper Royer sat down in a chair several feet away, in or near a hallway to the left of the front door,[61] while VPO Yukluk disappeared into a private office down that hallway.[62] The door to the VPSO shack was unlocked.[63]

Investigator Powell proceeded to question Defendant for about 75 minutes.[64] Trooper Powell began the interview by asking if Defendant knew what Investigator Powell wanted to talk to him about.[65] Defendant said that he did and began explaining what had happened on his fishing trip with Coopchiak.[66] Investigator Powell noted that he was "just here to find out what happened," and said, "My intention is whenever I leave here, I'm gonna go get back on a plane, and we're gonna get you back to wherever they picked you up from."[67] Investigator Powell further stated that he understood that Defendant had "already had a little bit of trouble" since Defendant's return from the river, and assured Defendant that he had "no intentions of taking [Defendant] with [him]."[68] Defendant indicated that he understood.[69] A few minutes into the interview, Investigator Powell seized Defendant's phone pursuant to a search warrant.[70]

---

[59] *Id.* at 53:22–25, 54:3–9, 55:2–4, 68:8–15.

[60] *Id.*; Gov't Ex. 3.

[61] Docket 35 at 43:19–22, 45:2–8, 52:19–24, 55:5–10; Gov't Ex. 3.

[62] Docket 35 at 52:25–53:2; Gov't Ex. 3.

[63] Docket 35 at 45:9–10.

[64] Def. Ex. 2.

[65] *Id.* at 0:25–37.

[66] *Id.* at 0:37–50.

[67] *Id.* at 2:04–14.

[68] *Id.* at 2:17–35.

[69] *Id.*

[70] Investigator Powell obtained the phone by asking if Defendant had it with him. After Defendant pulled his phone out, Investigator Powell asked if he could hold it, and Defendant gave him the phone. Investigator Powell then noted that he had a warrant and planned to seize the phone. *Id.* at 3:14–56. Investigator Powell later showed Defendant a copy of the warrant. *Id.* at 9:30–46. The parties do not dispute the validity of the search warrant.

Investigator Powell's questioning covered a variety of topics related to Defendant's fishing trip. Investigator Powell often prompted Defendant to expand on his answers and to keep telling him everything that had happened. About thirty minutes into the interview, Investigator Powell noted that "more happened than what [Defendant had] told him about that night, and so I need to know what all happened."[71] Investigator Powell then instructed Defendant to "tell [him] about the condoms."[72] Defendant said that he always carried condoms in his pocket.[73]

About one hour into the interview, Investigator Powell asked Defendant, "What else can you tell me? . . . What have you not told me? . . . What have you not told me about?"[74] Investigator Powell then presented Defendant with a photo of a gun.[75] Defendant said that the gun belonged to his father.[76] Investigator Powell asked, "Why do you have that?"[77] Defendant admitted that he carried it for bear protection.[78] Investigator Powell next said, "So when you don't tell me everything, it makes me wonder what else you're not telling me. So obviously we know things, right, so that's why I ask questions. And like I said, when you omit things, you're not *really* lying but you kinda are lying just through omission, right?"[79] Defendant then admitted that he was a felon and was not supposed to have the gun.[80]

A few minutes later, Investigator Powell asked Defendant if he currently had condoms on him, which Defendant denied.[81] Investigator Powell pointed out that Defendant had previously said he always had condoms on him.[82] Defendant explained that he did not have

---

[71] *Id.* at 29:15–40.
[72] *Id.* at 29:40–44.
[73] *Id.* at 29:44–50.
[74] *Id.* at 1:00:18–39.
[75] Docket 35 at 78:24–79:1.
[76] Def. Ex. 2 at 1:00:45–48.
[77] *Id.* at 1:00:50–52.
[78] *Id.* at 1:00:52–55.
[79] *Id.* at 1:01:08–30.
[80] *Id.* at 1:01:30–35. Investigator Powell was aware before the interview that Defendant was on probation and a felon. Docket 35 at 82:10–18.
[81] Def. Ex. 2 at 1:05:01–04.
[82] *Id.* at 1:05:04–07.

any on him now because he had thrown them out at the port.[83] Investigator Powell did not challenge this explanation. Investigator Powell then asked if Defendant had ever had sex with Coopchiak, which Defendant denied.[84] Investigator Powell characterized that answer as "deceptive," asked the question again, and Defendant admitted that he and Coopchiak had previously had sex on one occasion.[85] Investigator Powell then asked Defendant what else he had not told him and what else Defendant had been "deceptive" about, and described one of Defendant's statements—that he had told Coopchiak that he did not "really" do certain kinds of drugs—as "kind of deceptive."[86] Investigator Powell explained, "When you say stuff like that, it makes me wonder what else is going on that you're not *really* doing."[87] Investigator Powell followed up by asking if Defendant had hoped to have sex with Coopchiak on the fishing trip, and soon after asked Defendant why he was sweating.[88] Investigator Powell concluded the interview by allowing Defendant to ask his own questions.[89]

After the interview ended, Trooper Royer and VPO Yukluk drove Defendant back to his parents' house.[90]

### B. Procedural History

On November 19, 2024, a grand jury returned an indictment charging Defendant with one count of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).[91] Defendant now moves to suppress all statements made under questioning during the two interviews in October 2023.[92] The government opposes Defendant's Motion.[93]

On May 22, 2025, the Court held an evidentiary hearing on the Motion.[94] The

---

[83] *Id.* at 1:05:07–13.
[84] *Id.* at 1:05:33–37.
[85] *Id.* at 1:05:37–47.
[86] *Id.* at 1:06:17–25, 1:08:40–1:09:14.
[87] *Id.* at 1:09:30–40.
[88] *Id.* at 1:09:50–1:10:20.
[89] *Id.* at 1:10:38–1:15:56.
[90] Docket 35 at 46:15–16.
[91] Docket 2.
[92] Docket 25.
[93] Docket 27.
[94] Docket 31; Docket 35.

government called Trooper Harris, Trooper Royer, and Investigator Powell as witnesses.[95] Defendant cross-examined the government's witnesses but did not call any of his own. At the close of the hearing, both parties argued in support of their respective positions.[96] After the hearing, the parties each filed supplemental briefing.[97]

## II.   LEGAL STANDARDS

The Fifth Amendment "protects a person . . . against being incriminated by [their] own compelled testimonial communications."[98] This prohibition not only allows a person "to refuse to testify against himself at a criminal trial in which [they are] a defendant, but also 'privileges [them] not to answer official questions put to [them] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [them] in future criminal proceedings.'"[99]

"In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of [their] Fifth Amendment rights before custodial interrogations."[100] "[T]hese measures protect the individual against the coercive nature of custodial interrogation[.]"[101] A failure to advise an individual of their *Miranda* rights during a custodial interrogation "affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements" made during the interrogation.[102]

## III.   DISCUSSION

Defendant's primary argument for suppression of his statements during the two October 2023 interviews is that each interview was a custodial interrogation that required

---

[95] Docket 32.

[96] Docket 35 at 85–90.

[97] Docket 39; Docket 40.

[98] *Fisher v. United States*, 425 U.S. 391, 409 (1976); *see also* U.S. Const. amend. V. ("No person . . . shall be compelled in any criminal case to be a witness against himself."); *United States v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005) ("As a general rule, the Fifth Amendment speaks of compulsion[.]" (internal quotation marks and citation omitted)).

[99] *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).

[100] *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966)).

[101] *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

[102] *Oregon v. Elstad*, 470 U.S. 298, 306 n.1 (1985); *see also id.* at 307 (noting that this presumption is "irrebuttable for purposes of the prosecution's case in chief").

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

10

*Miranda* warnings, which the parties agree were not given.[103] Defendant also submits that the Court may suppress his statements from the second interview because those statements were "tainted" by the alleged *Miranda* violation during the first interview.[104] The government contests each of these arguments.[105]

The Court begins by addressing whether *Miranda* warnings were required on either October 9 or 20, before turning to Defendant's taint argument. In its analysis, the Court relies on the available audio recordings of each interview, the testimonies of the three troopers, whom the Court finds were credible, and the various photographs depicting the setting of the second interview that were admitted into evidence during the evidentiary hearing.

### A. *Miranda* Warnings Were Not Required Because Defendant Was Not in Custody.

A law enforcement officer is obligated to administer *Miranda* warnings only where a suspect is both (1) in custody and (2) interrogated.[106] Because the parties' dispute centers on whether Defendant was in custody at the time of his two law enforcement encounters, the Court limits its analysis to the custody issue.[107]

For purposes of *Miranda*, "'custody' is a term of art that specifies circumstances that are

---

[103] Docket 25 at 4–8.

[104] *Id.* at 5.

[105] Docket 27 at 5–13.

[106] *See United States v. Parkins*, 92 F.4th 882, 893 (9th Cir. 2024) ("Only suspects who are subject to 'custodial interrogation' are entitled to *Miranda* warnings." (quoting *Miranda*, 384 U.S. at 444)); *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.").

[107] Neither party explicitly addressed whether the troopers' questioning amounted to interrogation within the meaning of *Miranda*. *See Bradford v. Davis*, 923 F.3d 599, 618 (9th Cir. 2019) ("[N]ot all statements given by a person in custody are entitled to *Miranda* protection. Rather, interrogation 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" (quoting *Innis*, 446 U.S. at 300)); *Martinez v. Cate*, 903 F.3d 982, 993 (9th Cir. 2018) ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. The functional equivalent of interrogation is defined as 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (quoting *Innis*, 446 U.S. at 300–01)). For purposes of this report and recommendation, the Court assumes without deciding that Defendant was interrogated when he made all statements at issue.

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

11

thought generally to present a serious danger of coercion."[108] To determine whether an individual was in custody, a court considers the totality of the objective circumstances and asks whether a reasonable person in those circumstances would have felt they could freely walk away from the police.[109] The "ultimate inquiry" is "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."[110]

In *United States v. Kim*, the Ninth Circuit provided the following non-exhaustive list of factors that are pertinent to the custody inquiry: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."[111] An officer's views concerning the nature of an interrogation may also be relevant, but only if those views were "somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive [their] freedom to leave."[112]

### 1. Defendant was not in custody during his encounter with Trooper Harris on October 9, 2023.

Defendant first argues that he was in custody for purposes of *Miranda* when Trooper Harris questioned him on October 9, 2023. Defendant contends that the following facts demonstrate that a reasonable person in his position would not have felt free to leave: (1) Trooper Harris ordered Defendant to "exit the house and submit to questioning," and in so doing rejected Defendant's "attempt to avoid talking to [Trooper Harris] by denying his identity"; (2) Trooper Harris "challenged [Defendant's] answers" regarding Coopchiak's disappearance and "confronted [Defendant] with the fact that he was on probation and prohibited from drinking or possessing alcohol"; (3) Trooper Harris "explicitly commanded

---

[108] *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).

[109] *United States v. Kim*, 292 F.3d 969, 973–74 (9th Cir. 2002); *Craighead*, 539 F.3d at 1082; *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013).

[110] *New York v. Quarles*, 467 U.S. 649, 655 (1984) (citations omitted); *see also United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).

[111] *Kim*, 292 F.3d at 973 (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).

[112] *Stansbury v. California*, 511 U.S. 318, 325 (1994).

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

12

[Defendant] not to walk away" during the questioning; (4) and Trooper Harris "subjected [Defendant] to a portable breath test for the purpose of gathering evidence of a probation violation," which was the basis for Defendant's subsequent arrest.[113]

The government disputes that Defendant was in custody when Trooper Harris questioned him, asserting that: (1) Defendant did not make a "serious effort to conceal his identity" and he "willingly stepped out [of the house] and spoke to Trooper Harris"; (2) the purpose of Trooper Harris's visit was not to arrest Defendant, but rather to investigate Coopchiak's disappearance; (3) Trooper Harris did not confront Defendant with evidence of guilt as to the crime with which he was charged in this case; (4) Trooper Harris validly "probe[d] [Defendant] about his honesty" in answering questions about Coopchiak's disappearance; (5) Defendant consented to the portable breath test and voluntarily admitted that he was on probation and had been drinking; (6) the encounter was less than 30 minutes long and occurred in a setting where Defendant had "freedom of movement"; and (7) Defendant was not handcuffed or otherwise physically restrained.[114]

Considering the objective circumstances in their totality, the Court finds that a reasonable person in Defendant's situation would have felt free to leave.

### i. Language used to summon Defendant

The first *Kim* factor is the "language used to summon the individual."[115] In assessing this factor, a court evaluates whether the summons is phrased as a command or a request,[116] which informs whether the defendant voluntarily "agreed to accompany" officers to the place of interrogation[117] or voluntarily approached officers "understanding that questioning would

---

[113] Docket 25 at 5; Docket 40 at 7.

[114] Docket 27 at 5–7; Docket 39 at 4–7.

[115] 292 F.3d at 974.

[116] *See, e.g., id.* at 974–75 (distinguishing between being "ask[ed]" and being "order[ed]" to speak to police); *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (noting that "[a]n 'instruction' is short of an 'order,'" but that complying with an "instruction" is not the same as "voluntarily agree[ing] to accompany" police (internal quotation marks and citation omitted)).

[117] *Bassignani*, 575 F.3d at 884 (quoting *Crawford*, 372 F.3d at 1059).

ensue."[118]

Here, the Court finds that this factor weighs in favor of finding that Defendant was in custody. Trooper Harris arguably "summoned" Defendant three times. First, after Trooper Harris arrived at the residence, he instructed Defendant to "step out with [him]" and to "come on out here with [him]."[119] Although Trooper Harris clarified that he wished to speak with Defendant about Coopchiak, Trooper Harris did not ask for permission before starting his questioning. Second, midway through the encounter when Trooper Harris was attempting to contact the probation office, Trooper Harris told Defendant not to "walk off" and to "come back over here."[120] The record indicates that Trooper Harris's primary motivation in making these statements was to get Defendant to stop pacing around the yard, rather than to prevent him from leaving altogether, but his statements did not clearly convey that distinction.[121] And third, after Trooper Harris was unable to reach the probation office, Trooper Harris said, "Let's just go to post, you can come with me, you shouldn't be here drinking alcohol anyways. Go have a cup of coffee and sober up. Sound fair?"[122] In this instance, Trooper Harris's phrasing was less commanding, but his statements did not clearly communicate whether Defendant had a choice in the matter, particularly given the prior commands to exit the residence and not roam in the yard. Overall, the language that Trooper Harris used to summon Defendant and to keep him around suggests that Defendant's attendance was not completely voluntary.[123]

### ii. Extent to which Defendant was confronted with evidence of guilt

The second *Kim* factor is the "extent to which the defendant [was] confronted with

---

[118] *Kim*, 292 F.3d at 974 (emphasis omitted) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *Mathiason*, 429 U.S. at 495 (holding that suspect who speaks with police voluntarily, even at invitation of the police, is not "in custody").

[119] Def. Ex. 1 at 0:47–1:03.

[120] *Id.* at 15:05–20.

[121] *See id.* at 15:55–58; Docket 35 at 20:15–23.

[122] Def. Ex. 1 at 23:06–20.

[123] The Court does not view Defendant's false self-identification prior to Trooper Harris's instruction to step outside as significant in this analysis, as the false self-identification was not a clear attempt to decline questioning and did not have to be entertained.

evidence of guilt."[124] In evaluating this factor, a court considers the interrogator's tone and tactics.[125] Where the interrogator's questioning is generally "open and friendly" or where the defendant "prob[es] to find out how much the [interrogator] kn[ows]," this factor may weigh against a finding of custody.[126] Conversely, where the interrogator "adopts an aggressive, coercive, and deceptive tone," the second *Kim* factor tends to weigh in favor of a finding of custody.[127]

Here, the Court finds that this factor has neutral weight in the custody determination. On the one hand, the audio recording shows that Trooper Harris's tone was more brusque than "open" or "friendly," and that Defendant's engagement was limited to answering the questions posed to him. Moreover, Trooper Harris at times sounded skeptical or questioned the veracity of Defendant's account of his fishing trip with Coopchiak.[128] But on the other hand, Trooper Harris never overtly accused Defendant of lying or of being involved in any crime related to Coopchiak's disappearance. Indeed, Trooper Harris never said that AST believed a crime had occurred; he repeatedly framed his task as simply "trying to find [Coopchiak]."[129] In addition, to the limited extent that Trooper Harris identified discrepancies between Defendant's statements and information previously obtained by AST, Trooper Harris did not press Defendant for an explanation.[130] For the most part, Trooper Harris merely asked

---

[124] 292 F.3d at 974.

[125] *See Bassignani*, 575 F.3d at 884–85.

[126] *Id.* at 884–885 & n. 7; *cf. also United States v. Crooker*, 688 F.3d 1, 11-12 (1st Cir. 2012) (holding that defendant was not in custody where, among other things, defendant's "interactions with the [law enforcement] agents were cooperative").

[127] *Bassignani*, 575 F.3d at 884.

[128] *E.g.*, Def. Ex. 1 at 5:13–18 ("So your story's not really like, so why would she just take your boat and run off?"), 8:50–57 ("I asked you if you told me the truth and you looked down that's like a nonverbal cue that you have something else to tell me, what else, what else happened?"), 13:30–56 ("You're acting like you're hiding something from me, with this whole thing with her. Like I can't get ahold of you, and you're [indiscernible] my voicemails or my text messages, and then I talk to you about her and you give me a couple of different stories, so I don't know if I believe you that you're just up there doing whitefish and then she just left because you fell asleep. Right?").

[129] *E.g.*, *id.* at 1:40–53, 4:51–56.

[130] The only instance where Trooper Harris confronted Defendant with evidence of guilt with respect to Coopchiak's disappearance was when Trooper Harris pushed back on Defendant's explanation that Coopchiak had left the boat where it was found, noting that another individual had told them that Defendant had told him a different story. *Id.* at 5:50–6:36.

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

15

Defendant straightforward questions about the circumstances of the trip. Trooper Harris's line of questioning was direct, but his conduct was a far cry from coercive or deceptive.[131]

Furthermore, the Court disagrees with Defendant that Trooper Harris confronted him with evidence of guilt by "point[ing] out that [he] was on probation and prohibited from drinking."[132] The record demonstrates that Trooper Harris did not "point out" this information; rather, he asked whether Defendant was on probation and whether Defendant was permitted to drink under the terms of his probation agreement.[133] Posing those questions cannot be equated to confronting Defendant with evidence of guilt, particularly where the questions were unrelated to any potential crime.

### iii. The physical surroundings of the detention

The third *Kim* factor is the "physical surroundings of the detention."[134] An interrogation that is conducted "in familiar surroundings weighs against finding that the defendant is in custody."[135] For example, where an interrogation takes place in the defendant's home, courts "have generally been much less likely to find that [the interrogation] . . . was custodial in nature."[136] However, even where an interrogation is conducted in a familiar setting, this factor may weigh in favor of a custody finding where there is a sufficiently "police-dominated atmosphere."[137] Significant considerations include whether the defendant was kept in isolation from others, as well as the number of law enforcement personnel and whether they were armed.[138]

---

[131] *See United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (finding that officers' "relentlessness gave rise to a psychological coercion beyond that inherent in a typical noncustodial interrogation" (citing *Mathiason*, 429 U.S. at 495); *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984))); *see also United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) ("The questioning progressed for over an hour and turned accusatory—Wauneka was told that he supplied information that only a perpetrator would know, that he matched the description of the rapist, and that he had better tell the truth.").

[132] Docket 40 at 2.

[133] Def. Ex. 1 at 9:05–12.

[134] 292 F.3d at 974.

[135] *Bassignani*, 575 U.S. F.3d at 885 (citing *United States v. Eide*, 875 F.3d 1429, 1436 (9th Cir. 1989)).

[136] *Craighead*, 539 F.3d at 1083 (citations omitted).

[137] *Id.* at 1084.

[138] *Id.* at 1083; *see also Beraun-Panez*, 830 F.2d at 127 (concluding that police's enforced isolation of defendant from others was a "technique of psychological coercion" that "contributed to the custodial

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR
16
Case 3:24-cr-00130-SLG-KFR    Document 44    Filed 08/29/25    Page 16 of 30

Here, the Court finds that this factor weighs against finding that Defendant was in custody. The interrogation took place in the middle of a residential driveway.[139] Defendant had just been inside the residence—a small cabin—along with four other individuals. The driveway was plainly an open, familiar setting.[140]

The familiarity of this setting was not undermined by a police-dominated atmosphere. Although bringing Defendant outside separated him from the rest of the occupants, Trooper Harris did not "ke[ep] Defendant physically isolated" from either those individuals or "the outside world."[141] Defendant was mere feet away from the residence,[142] and the residence remained open to him: at one point, Defendant returned inside to retrieve his phone.[143] Moreover, while Trooper Harris was armed and in uniform, he was the only law enforcement officer present during the questioning.[144] Trooper Harris also stood a reasonable distance away from Defendant while they talked, and did not position himself in a way that prevented Defendant from leaving.[145] Under these circumstances, the physical surroundings of Defendant's detention did not operate to restrain his freedom of movement.

### iv. Duration of the detention

The fourth *Kim* factor is the "duration of the detention."[146] In *Kim*, the Ninth Circuit determined that the length of a 90-minute detention, during which the defendant was interrogated for 45 to 50 minutes, weighed in favor of a custody finding.[147] Similarly, in *United States v. Barnes*, the Ninth Circuit indicated that a roughly two-hour interrogation weighed in

---

nature of the interrogation"); *United States v. Mora-Alcaraz*, 986 F.3d 1151, 1156 (9th Cir. 2021) (stating that despite familiar setting of public mall, "the police created what was undoubtedly a police-dominated atmosphere" through presence of four armed officers and two police cars, with one of those cars "blocking the travel lane and flashing amber lights").

[139] Docket 35 at 30:4–10, 30:23–24, 31:2–10.

[140] *See id.* at 31:5–10.

[141] *See Kim*, 292 F.3d at 977.

[142] Docket 35 at 30:17–31:15.

[143] Def. Ex. 1 at 10:30–40.

[144] Docket 35 at 14:11–17.

[145] *Id.* at 30:23–25; *cf. United States v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009) (noting that officers "did not position themselves to prevent [the defendant from leaving]," and officers "were a normal conversational distance from [the defendant]," which weighed against custody).

[146] 292 F.3d at 974.

[147] *Kim*, 292 F.3d at 974, 981.

favor of custody.[148]  In contrast, in *United States v. Mora-Alcaraz*, the Ninth Circuit stated that a 36-minute detention "may weigh against custody."[149]  In other cases, the Ninth Circuit has found interrogations to be non-custodial where they lasted for 20 minutes,[150] 45 minutes,[151] and "more than an hour,"[152] respectively.

Here, the Court finds that this factor weighs against a finding that Defendant was in custody.  Less than half an hour passed from the beginning of Trooper Harris's contact with Defendant to their arrival at the local AST post.[153]  The brevity of this detention—much of which Trooper Harris spent on activities related to the potential probation violation, as opposed to questioning Defendant about Coopchiak's disappearance—is more consistent with a lack of custody than with custody.

### v. Degree of pressure applied to detain Defendant

The fifth *Kim* factor is the "degree of pressure applied to detain the individual."[154]  In a court's assessment of this factor, relevant considerations include whether the defendant was at any point restrained by psychological pressure, such as threats, or physical force.[155] Furthermore, an officer's assurances to the defendant that they are free to leave can be strong evidence that an interrogation is non-custodial,[156] but the lack of such assurance is not

---

[148] 713 F.3d at 1204 (citing *Kim*, 292 F.3d at 977); *accord Bassignani*, 575 F.3d at 887 (holding that length of two-and-a-half-hour interrogation weighed in favor of custody).

[149] 986 F.3d at 1156.

[150] *Hayden*, 260 F.3d at 1063, 1066–67.

[151] *United States v. Hudgens*, 798 F.2d 1234, 1237 (9th Cir. 1986).

[152] *Crawford*, 372 F.3d at 1052.

[153] *See* Def. Ex. 1 at 0:43–27:00.

[154] 292 F.3d at 974.

[155] *Craighead*, 539 F.3d at 1083; *see also Mora-Alcaraz*, 986 F.3d at 1157 ("Despite the lack of physical restraints, Mora-Alcaraz was subjected to severe pressure as a result of the police separating him from his son. . . . [T]he police were well aware that a father would not walk away from a public place and leave his young son with strangers."); *Barnes*, 713 F.3d at 1204 (observing that defendant was under pressure to attend meeting with his parole officer that wound up being interrogation, in part because any failure to attend meeting would have constituted parole violation).

[156] *See Crawford*, 372 F.3d at 1052; *see also Bassignani*, 575 F.3d at 886 ("We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time."); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005) (holding that interrogation was non-custodial in part because suspect was "told that his cooperation was voluntary and that he was free to terminate the interview at any time ").

dispositive.[157]

Here, the Court finds that this factor weighs slightly against finding that Defendant was in custody during Trooper Harris's questioning. Trooper Harris did not draw a weapon, use handcuffs, or physically restrain Defendant in any other way. Trooper Harris similarly did not threaten Defendant. In addition, Trooper Harris did not pressure Defendant into yielding any of the information that eventually led Trooper Harris to call the local probation office regarding Defendant's alcohol use. Moreover, even after Trooper Harris confirmed that Defendant was currently under the influence in violation of his probation agreement, Trooper Harris let Defendant out of his direct sight to reenter the residence.[158]

It is true that Trooper Harris did not inform Defendant that he was not under arrest or that he was free to leave or to decline questioning. However, the absence of such clarification was largely mitigated by the lack of physical restraints, threats, or significant psychological pressures applied. Furthermore, the Court does not view Defendant's eventual arrest on an alcohol-related probation violation at the direction of a probation officer as especially probative of whether Defendant was in custody while he was interrogated about Coopchiak's disappearance.[159]

### vi. Conclusion

Under the circumstances of this case, the balance of the *Kim* factors indicates that Defendant was not in custody during Trooper Harris's questioning on October 9, 2023. The "overall tenor of the interrogation was not coercive,"[160] and the circumstances did not evince

[157] *Craighead*, 539 F.3d at 1088 ("The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave[.]").

[158] Docket 35 at 15:1–2; Def. Ex. 1 at 10:30–40, *cf. Craighead*, 539 F.3d at 1085 ("[R]estraint amounting to custody may . . . be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times." (citing *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007); *United States v. Griffin*, 922 F.2d 1343, 1350–51 (8th Cir. 1990))).

[159] *Cf. Craighead*, 1086 (emphasizing that *Miranda* doctrine implicates types of restraints on freedom of action that "increase[] the likelihood that [the defendant] w[ill] succumb to police pressure to incriminate [themselves]" (citing *Miranda*, 384 U.S. at 467)); *Berkemer*, 468 U.S. at 437 ("Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.").

[160] *Bassignani*, 575 F.3d at 887.

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

19

Case 3:24-cr-00130-SLG-KFR   Document 44   Filed 08/29/25   Page 19 of 30

a "restraint on [Defendant's] freedom of movement of the degree associated with a formal arrest."[161] The Court therefore concludes that *Miranda* warnings were not required.

### 2. Defendant was not in custody during his interview on October 20, 2023.

Defendant next asserts that he was in custody for purposes of *Miranda* when Trooper Powell questioned him on October 20, 2023. Defendant maintains that a reasonable person in his position would not have felt free to leave because: (1) Trooper Royer and VPO Yukluk "showed up unannounced to his home and drove him in a locked cage to [VPSO] headquarters to be interrogated" by Trooper Powell, who "implied that officers maintained control over the length of the interview"; (2) Trooper Powell accused Defendant of withholding information and confronted him with evidence regarding the gun; (3) Defendant would have had to walk home if he had tried to leave the VPSO shack on his own; (4) Trooper Powell seized Defendant's phone early in the interview pursuant to a search warrant and did not tell Defendant he was free to leave or to decline questioning; and (5) Defendant's "recent attempt on October 9 to avoid police questioning and walk away was unsuccessful and met with orders to comply."[162]

The government responds that Defendant was not in custody during the October 20 interview for the following reasons: (1) Defendant agreed to accompany Trooper Royer and VPO Yukluk to the VPSO shack for questioning, where Trooper Powell informed Defendant that he would not be arrested and that he would be returned home when they were done talking; (2) Trooper Powell brought up the gun in order to "find[] out more about the missing person, not [to] charg[e] [Defendant] with a crime"; (3) the interview took place in the "open office setting" of the VPSO shack, which was unlocked and located not far from where Trooper Royer and VPO Yukluk had picked Defendant up; (4) the interview lasted 75 minutes; (5) the seizure of Defendant's phone was "lawful[] and professional[]"; and (6) Defendant was

---

[161] *See Kim*, 292 F.3d at 973.
[162] Docket 35 at 6–8; Docket 40 at 7–9.

not arrested at the end of the interview.[163]

Considering the objective circumstances in their totality, the Court finds that a reasonable person in Defendant's situation would have felt free to leave.

### i. Language used to summon Defendant

The first *Kim* factor—the language used to summon the defendant—weighs against finding that Defendant was in custody. The record shows that during the initial contact at Defendant's parents' house, Trooper Royer politely asked Defendant if he would be willing to go down to the VPSO shack to speak with an investigator who had some questions for Defendant.[164] There is no indication that Defendant ignored or challenged the request, or asked if he had to comply, or that Trooper Royer had to cajole, convince, or command Defendant to leave the residence.[165] The absence of such resistance, as well as the mild tone and phrasing of Trooper Royer's request, suggest that Defendant's acquiescence was voluntary.[166]

### ii. Extent to which Defendant was confronted with evidence of guilt

The second *Kim* factor—the extent to which the defendant was confronted with evidence of guilt—weighs slightly in favor of finding that Defendant was in custody. On the one hand, the tenor of the interview was generally open and friendly: Investigator Powell's tone

---

[163] Docket 27 at 7–9; Docket 39 at 9–15. The government also maintains that Defendant's criminal history, including "supervision terms, prior probation violations, and multiple custodial arrests," is a factor that weighs against the notion that he was in custody on October 20. Docket 27 at 10. The government suggests that this experience "make[s] him more experienced with the criminal justice system than the typical layperson" and informs whether a reasonable person with such a background would have felt free to leave the interview. Docket 27 at 11. The Court agrees with Defendant that it is inappropriate to consider this background in the *Miranda* custody analysis. *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004) (explaining that consideration of suspect's individual characteristics "could be viewed as creating a subjective inquiry" and noting that "the relationship between a suspect's past experiences and the likelihood a reasonable person with that experience would feel free to leave often will be speculative").

[164] Docket 35 at 39:9–16. Trooper Royer testified that his demeanor when contacting individuals in a place such as New Stuyahok is generally "friendly but professional," and similar to his demeanor at the evidentiary hearing, which the Court finds was consistent with this description. *Id.* at 36:23–37:2.

[165] *Id.*; *see also id.* at 49:12–50:13.

[166] *See Bassignani*, 575 F.3d at 883.

was gentle and mild-mannered, even when he probed Defendant for more information. For the majority of the questioning, Investigator Powell simply asked Defendant to recount what had happened in the time since Defendant left for his fishing trip with Coopchiak.

On the other hand, Investigator Powell challenged certain of Defendant's answers and pointed out that Defendant's language or behavior occasionally seemed deceptive or suspicious. In contrast to Trooper Harris, who used similar techniques, Investigator Powell further asked Defendant repeatedly to tell him everything that had happened, and suggested that failure to tell him everything was akin to lying through omission.[167] In addition, Trooper Powell showed Defendant a photo of the gun that he was not legally allowed to possess, while asking, "Why do you have that?"[168] On the whole, the Court finds that Trooper Powell confronted Defendant with some evidence of guilt, but Trooper Powell's soft and unthreatening tone and the relatively limited nature of the confrontations mitigate the strength of this factor.

### iii. The physical surroundings of the detention

The third *Kim* factor—the physical surroundings of the detention—weighs against finding that Defendant was in custody. Unlike the October 9 interview, the October 20 interview took place in an unfamiliar setting: the VPSO shack, which roughly resembled a police station.[169] Despite this more official setting, though, the environment was relatively informal. The main area of the building where the interview occurred was not large, but it was far from a confined space.[170] The front door of the building was unlocked.[171] Although three officers were present in the building, only one—Investigator Powell—interrogated Defendant. Trooper Royer and VPO Yukluk remained somewhat close by but were not in the immediate vicinity.[172] Moreover, Trooper Royer was the only officer who was both armed and in

---

[167] *See* Def. Ex. 2 at 1:00:18–39, 1:01:08–30, 1:05:04–07, 1:05:37–47, 1:06:17–25, 1:08:40–1:10:20.
[168] *Id.* at 1:00:15–40.
[169] Docket 35 at 37:18–19.
[170] *See* Gov't Exs. 1–4.
[171] Docket 35 at 45:9–10.
[172] *Id.* at 43:19–22, 45:2–8, 53:2, 55:5–10; Gov't Ex. 3.

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

22

uniform.[173]  Furthermore, Investigator Powell's positioning next to Defendant at the desk was not intimidating, particularly compared to alternative arrangements such as sitting across from each other or backing Defendant into the wall.[174]  Overall, the Court finds that the physical surroundings would not have restricted or significantly deterred a reasonable person from exiting the building.[175]

Defendant makes much of the fact that his only option for independently returning to his parents' residence was to walk home, since Trooper Royer and VPO Yukluk had given him a ride to the VPSO shack.[176]  It is true that a defendant's dependence on police for return transportation can weigh in favor of custody.[177]  In this case, however, the residence was less than a mile away from the VPSO shack, down a dirt road.[178]  Given this proximity, walking would have been a reasonable way to return to the residence, and Defendant was therefore not wholly reliant on the officers to bring him back there.[179]

### iv.  Duration of the detention

The fourth *Kim* factor—the duration of the detention—weighs slightly in favor of finding that Defendant was in custody.  With respect to this factor, the facts in this case are comparable to those in *Kim*.  There, the Ninth Circuit described the defendant's 45-to-50-minute interrogation as "full-fledged" as opposed to a "brief inquiry," particularly where the defendant had been detained for 40 to 45 minutes before questioning began.[180]  Here, Defendant's interrogation lasted approximately 75 minutes, with his transport to the VPSO

---

[173] Docket 35 at 41:25–42:1; 48:19–49:4, 70:23–71:3.

[174] *See id.* at 53:22–25, 54:3–9, 55:2–4, 68:8–15.

[175] *See Mathiason*, 429 U.S. at 495 (holding that *Miranda* warnings are not required "simply because the questioning takes place in the station house").

[176] Docket 40 at 7.  Defendant asserts without citation that the walk home likely would have been in "below-freezing temperatures."  *Id.*  Because the record does not contain evidence that supports this assertion, the Court declines to credit it.

[177] *See Wauneka*, 770 F.2d at 1439; *United States v. Toliver*, 480 F. Supp. 2d 1216, 1219 (D. Nev. 2007).

[178] Docket 35 at 37:10–21, 42:22–43:2, 51:11–14.

[179] The Court likewise rejects Defendant's suggestion that his brief ride to the VPSO shack in the VPSO vehicle, where he was seated in the back, which had a partition between the front and back seats, and where the rear doors did not open from the inside, is suggestive of whether he was in custody during the subsequent interrogation.  *See* Docket 40 at 7; Docket 35 at 51:1–10.

[180] *Kim*, 292 F.3d at 972, 980.

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

23

shack adding a few more minutes to the encounter.[181]  At the same time, however, there is no indication that the interrogation was a "marathon session designed to force a confession."[182]  As a result, the Court "accords less weight to this factor."[183]

### v. Degree of pressure applied to detain Defendant

The fifth *Kim* factor—the degree of pressure applied to detain the defendant—weighs against finding that Defendant was in custody.  Defendant was not put into handcuffs or subjected to any other physical restraints.[184]  Investigator Powell also told Defendant that he had "no intentions of taking [Defendant] with [him]" at the end of the interview.[185]  Just before making this statement, Investigator Powell referenced Defendant's prior "trouble" with Trooper Harris, thereby conveying the impression that—unlike the last encounter—this interview would not lead to Defendant's arrest.[186]  Furthermore, Defendant "was in fact not arrested at the conclusion of the interview," which is suggestive of noncustodial questioning.[187]

Defendant maintains that the officers nevertheless exerted psychological pressure over him in several ways.  Defendant first submits that Investigator Powell implied that Defendant could not leave the interview until Investigator Powell "le[ft] here" and "g[ot] back on a plane," as Investigator Powell said Defendant would be brought back home "whenever" those events occurred.[188]  In support of this argument, Defendant cites *United States v. Carroll*, where a district court deemed detectives' statement that the defendant could go home only "when *we're* done talking" to "impl[y] a degree of control by the [police]."[189]  The Court generally agrees with Defendant and the *Carroll* court that this type of conditional phrasing can weigh in favor of

[181] Def. Ex. 2; Docket 35 at 43:5.
[182] *Bassignani*, 575 F.3d at 886 (internal quotation marks omitted) (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)).
[183] *Id.*
[184] *Quarles*, 467 U.S. at 655 (considering whether defendant was handcuffed during questioning as relevant factor in determining whether defendant was in custody for purposes of *Miranda*).
[185] Def. Ex. 2 at 2:04–35.
[186] *Id.*
[187] *Crawford*, 372 F.3d at 1060 (quoting *United States v. LeBrun*, 363 F.3d 715, 722 (9th Cir. 2004) (en banc)).
[188] Docket 25 at 7–8.
[189] 102 F. Supp. 3d 1134, 1137 (N.D. Cal. 2015).

finding custody. In this case, however, Investigator Powell's statement was less potent than the detectives' statement in *Carroll*, and his tone was not authoritative.[190] Moreover, even in *Carroll*, the district court concluded that the defendant's submission to custody "may have been voluntary," if "barely so," where the detectives also "told [the defendant] they did not have time for him to shower, . . . that he should just put on his shoes and get in the car[,] . . . [and that they] 'needed' to bring him down to the police station for questioning rather than interview him at a motel or a public place nearby."[191] Here, in contrast, Defendant fails to identify and the record does not reveal any other statements by Investigator Powell regarding Defendant's ability to leave that could have led a reasonable person in Defendant's position to believe they were required to submit to questioning.

Defendant next contends that the officers created a custodial atmosphere by separating him from family members and by seizing his cell phone.[192] Although the Ninth Circuit has held that "isolat[ion] . . . from the outside world" can be suggestive of custody, that is generally only true of "enforced isolation."[193] For example, in *Kim*, the Ninth Circuit found enforced isolation weighing in favor of custody where the police allowed the defendant to enter the store where she was ultimately interrogated, but quickly afterward closed and locked the entrance to the store to prevent the defendant's husband from joining.[194] Similarly, in *United States v. Beraun-Panez*, the Ninth Circuit found enforced isolation weighing in favor of custody where officers "intercept[ed]" and "sen[t] away" a coworker of the defendant who had attempted to approach the ongoing interrogation.[195] Here, however, the record contains no evidence that anybody at Defendant's parents' residence sought to go with Defendant to the VPSO shack, or that Trooper Royer or VPO Yukluk denied any such request or attempt. The Court thus declines to ascribe much significance to Defendant's physical isolation from others during the

---

[190] *See* Def. Ex. 2 at 2:04–14 ("My intention is whenever I leave here, I'm gonna go get back on a plane, and we're gonna get you back to wherever they picked you up from.").

[191] *Carroll*, 102 F. Supp. 3d at 1137.

[192] Docket 40 at 6.

[193] *Kim*, 292 F.3d at 977 (citing *Beraun-Panez*, 830 F.2d at 127).

[194] *Id.* at 971, 977.

[195] 812 F.2d at 582.

interrogation. Similarly, because Defendant had not tried to communicate with anybody with his cell phone before Investigator Powell seized the phone pursuant to a search warrant, the resulting isolation was not truly enforced, lessening the gravity of that seizure in the custody analysis.[196]

Overall, the Court finds that the officers applied no physical pressure to detain Defendant, and applied only minimal psychological pressure through their words and actions.

### vi. Conclusion

Under the circumstances of this case, the balance of the *Kim* factors indicates that Defendant was not in custody during Investigator Powell's questioning on October 20, 2023. Defendant's prior encounter with Trooper Harris in Dillingham 11 days earlier does not affect this calculus.[197] The Court therefore concludes that *Miranda* warnings were not required.

### B. Even If Defendant's *Miranda* Rights Were Violated on October 9, Suppression of His October 20 Statements Is Not Warranted.

Finally, the Court briefly addresses Defendant's suggestion that his statements during the October 20 interview were "tainted by the [October 9] interview."[198] As discussed above, the Court concludes that it was not necessary for Trooper Harris to administer *Miranda* warnings when he questioned Defendant on October 9. Nevertheless, even if a *Miranda* violation had occurred on that date, that would not justify suppression of Defendant's October 20 statements.

---

[196] The Court further finds that the manner in which Investigator Powell seized Defendant's phone was not aggressive. *See* Def. Ex. 2 at 3:14–56, 9:30–46.

[197] In arguing that the circumstances of the October 9 encounter would have informed a reasonable person's perception of their freedom to leave the October 20 interrogation, Defendant relies on *United States v. Scharf*, 608 F.2d 323 (9th Cir. 1978). Docket 25 at 6. In *Scharf*, the Ninth Circuit considered the effect of prior questioning in evaluating whether two interrogations were custodial. 608 F.2d at 324–25. There, officers had already spent "considerable time" questioning the defendant on the same day of the first challenged interrogation. The second challenged interrogation took place the next evening, and by that time, the officers had questioned the defendant a total of three times. *Id.* The court determined that both interrogations were custodial and noted that this recent, extensive prior questioning was a factor supporting that conclusion. *Id.* at 325. Although the Court agrees with Defendant that repeated interrogations as part of the same investigation can be suggestive of custody, the circumstances of Defendant's single encounter on October 9 do not render his interrogation 11 days later custodial.

[198] *See* Docket 25 at 5.

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

26

Case 3:24-cr-00130-SLG-KFR    Document 44    Filed 08/29/25    Page 26 of 30

A *Miranda* violation does not necessarily amount to a constitutional violation.[199] As the Supreme Court has explained, the rule in *Miranda* arose out of a concern that the "possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's [Fifth Amendment] privilege against self-incrimination might be violated."[200] Accordingly, an officer's failure to administer *Miranda* warnings before a custodial interrogation "creates a presumption of compulsion" that requires exclusion of unwarned statements made during the interrogation, even if those statements "are otherwise voluntary within the meaning of the Fifth Amendment."[201] In this way, the *Miranda* exclusionary rule "sweeps more broadly than the Fifth Amendment itself."[202]

It is largely for this reason that a "simple failure to administer the warnings" required by *Miranda* will often not lead to suppression of evidence beyond the statements made during the custodial interrogation.[203] "[T]he *Miranda* presumption . . . does not require that fruits of otherwise voluntary statements be discarded as inherently tainted."[204] Instead, the admissibility of the "fruits" of a *Miranda* violation turns on the voluntariness of the defendant's unwarned

---

[199] *See Elstad*, 470 U.S. at 307 ("The *Miranda* exclusionary rule . . . may be triggered even in the absence of a Fifth Amendment violation.").

[200] *United States v. Patane*, 542 U.S. 630, 639 (2004); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("[T]he coercion inherent in custodial interrogation . . . heightens the risk that an individual will not be 'accorded [their] privilege under the Fifth Amendment not to be compelled to incriminate [themselves][.]'" (quoting *Miranda*, 384 U.S. at 439)).

[201] *Elstad*, 470 U.S. at 307; *see also Patane*, 542 U.S. at 642–43 (noting that "a strong deterrence-based argument could be made for suppression of the fruits" of a mere *Miranda* violation if a *Miranda* violation were always a constitutional violation).

[202] *Elstad*, 470 U.S. at 307.

[203] *Id.* at 309. In several cases, the Supreme Court has limited the reach of *Miranda* where a *Miranda* violation was not accompanied by actual coercion. *See, e.g., id.* ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."); *Patane*, 542 U.S. at 644 (holding that suppression of physical fruits of *Miranda* violation is not warranted where defendant's unwarned statements were voluntary); *Michigan v. Tucker*, 417 U.S. 433, 448–49 (1974) (declining to exclude third party's testimony based on violation of defendant's *Miranda* rights where defendant was not coerced).

[204] *Elstad*, 470 U.S. at 307. In the Fourth Amendment context, the exclusionary rule requires suppression of "evidence later discovered and found to be derivative of" an illegal search or seizure, the "so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (internal quotation marks and citation omitted).

statements.[205] Where those fruits are subsequent incriminating statements, a court may evaluate the voluntariness of both the initial (unwarned) and subsequent (warned or unwarned) statements.[206]

Here, Defendant does not contend that any of the statements he made during the two interviews were involuntary. As to the connection between the two interviews, Defendant argues only that the circumstances surrounding the October 9 encounter affected his perception of whether he was free to leave during the October 20 interview.[207] However, custody is a separate matter from voluntariness.[208] The focus of the voluntariness inquiry is whether, under the totality of the circumstances, the defendant's "will was overborne by the circumstances surrounding the giving of [the] confession."[209] The Court sees no basis in the record to conclude that any of Defendant's statements—including his October 20 admissions about the gun that led to the charge against him in this case—were made involuntarily, whether through coercion or otherwise.[210] To the contrary, the fact that neither Trooper Harris nor Defendant even referenced the gun during the October 9 interview, and that the October 20 admissions occurred 11 days later, in a different location, and to a different investigator, belies

---

[205] *See Elstad*, 470 U.S. 298, 309 (1985) ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."). *Medeiros v. Shimoda*, 889 F.2d 819, 823–24 (9th Cir. 1989) (holding that *Elstad* analysis applied where defendant made one incriminating statement during custodial interrogation without *Miranda* warnings and second incriminating statement while in custody but not under interrogation, stating that "key issue" regarding admissibility of defendant's second statement was "whether [he] made it voluntarily").
[206] *See Elstad*, 470 U.S. at 310 ("When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."); *see also Crawford*, 372 F.3d at 1058 (explaining that for evidence to be considered fruit, "it must be directly or indirectly attributable to the constitutional violation" (internal quotation marks omitted) (quoting *United States v. Duchi*, 944 F.2d 391, 395 (8th Cir. 1991))).
[207] *See* Docket 40 at 8–9.
[208] *Cf. Medeiros*, 889 F.2d at 825 ("[C]ustody alone is not sufficient to demonstrate involuntariness.").
[209] *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).
[210] Defendant's admissions that the gun belonged to his father and that Defendant carried it for bear protection despite being a felon are the only incriminating statements identified in his briefing. Docket 40 at 5.

Defendant's contention that the October 9 incident significantly affected his frame of mind during the October 20 interview.[211]

The Court therefore concludes that even if Defendant's *Miranda* rights were violated during the October 9 interview, any such violation would not warrant suppression of the statements he made during the October 20 interview.

## IV. CONCLUSION

In sum, the Court concludes that Defendant was not in custody for purposes of *Miranda* during either of the two interviews at issue. The statements Defendant made during those interviews should not be suppressed because there was no *Miranda* violation and because Defendant's statements were not involuntary. The Court thus recommends that the Motion to Suppress at Docket 25 be **DENIED**.

DATED this 29th day of August, 2025, at Anchorage, Alaska.

*/s/ Kyle Reardon*
KYLE F. REARDON
United States Magistrate Judge
District of Alaska

## NOTICE OF RIGHT TO OBJECT

Under 28 U.S.C. § 636(b)(1), a district court may designate a magistrate judge to hear and determine matters pending before the Court. For dispositive matters, a magistrate judge

---

[211] *See Elstad*, 470 U.S. at 310; *Medeiros*, 889 F.2d at 825 (holding that defendant made second incriminating statement voluntarily where (1) there was only a half-hour lapse between the two statements, (2) second statement was made at a different location, and (3) defendant "remained in police custody from the time he made his first incriminating statement to the time he made his second incriminating statement" (citing *Elstad*, 470 U.S. at 315)); *cf. also Crawford*, 372 F.3d at 1057 (holding that lack of confession during initial "presumed illegal detention" indicated that defendant's later statement at different location was not a "product of being in unlawful custody"); *Missouri v. Seibert*, 542 U.S. 600, 612 n. 4 (2000) ("In a sequential confession case [involving confessions given both before and after *Miranda* warnings] . . . the subsequent statement [may be] inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.").

R&R re Motion to Suppress
*United States v. Chocknok*
29

reports findings of fact and provides recommendations to the presiding district court judge.[212] A district court judge may accept, reject, or modify, in whole or in part, the magistrate judge's findings and recommendations.[213]

A party may file written objections to the magistrate judge's findings and recommendations within fourteen (14) days.[214] A response to the objections may be filed within seven (7) days after any objection is filed.[215] Objections and responses are limited to five (5) pages in length and should not merely reargue positions previously presented. Rather, objections and responses should specifically identify the findings or recommendations objected to, the basis of the objection, and any legal authority in support. Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment.[216]

---

[212] 28 U.S.C. § 636(b)(1)(B).
[213] *Id.* § 636(b)(1)(C).
[214] *Id.*; L.M.J.R. 7(a)(1).
[215] L.M.J.R. 7(a)(2).
[216] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).

R&R re Motion to Suppress
*United States v. Chocknok*
3:24-cr-00130-SLG-KFR

30